# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEROME LEE CROSS,<br><br>    Petitioner,<br><br>    v.<br><br>KINGS COUNTY SHERIFF,<br><br>    Respondent. | Case No. 1:23-cv-01246-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS<br><br>ORDER DIRECTING CLERK OF COURT TO RANDOMLY ASSIGN DISTRICT JUDGE |

Petitioner Jerome Lee Cross is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On March 23, 2021, Petitioner was convicted in the Kings County Superior Court of vandalism greater than $400. On May 10, 2021, Petitioner was sentenced to an imprisonment term of four years. (2 CT[1] 596.) On September 14, 2022, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Cross, No. F082774, 2022 WL 4230918 (Cal. Ct. App. Sept. 14, 2022). On November 30, 2022, the California Supreme Court denied Petitioner's petition for review. (LDs[2] 18, 19.) On July 7, 2023, Petitioner filed a state habeas

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on November 2, 2023. (ECF No. 6.)
[2] "LD" refers to the documents lodged by Respondent on November 2, 2023. (ECF No. 6.)

1

petition in the California Supreme Court, which denied the petition on August 9, 2023. (LDs 20, 21.)

On August 21, 2023, Petitioner filed the instant federal petition for writ of habeas corpus, raising the following claims for relief: (1) insufficiency of the evidence; and (2) instructional error. (ECF No. 1.) On November 8, 2023, Respondent filed an answer. (ECF No. 7.) To date, no reply has been filed, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[3]

At approximately 3:00 a.m. on Sunday, August 2, 2020, Officer Rubalcava was in her patrol vehicle and parked in the rear compound of the Hanford Police Department. She received a dispatch that an act of vandalism had just occurred at the police department's front glass door entrance. The glass was broken out of the door frame, and a rock that was "a little smaller than a football" was found inside the building.

Officer Rubalcava drove on Lacey Boulevard to look for the suspect and saw defendant walking fairly quickly on the street. Defendant kept his head down, and he was sweating profusely and breathing heavily. Rubalcava contacted defendant. He was initially calm but became irate with another officer.

Officer Rubalcava arrested defendant and took him to the jail for booking. When Rubalcava escorted him into the jail, defendant stumbled and needed assistance so he would not fall. During the booking search, defendant was found in possession of a usable amount of methamphetamine. When the drugs were found, defendant said, "[I]f I had known that was there I would have smoked it already."

It was stipulated to the jury that defendant threw the rock that broke the glass door.

The prosecution introduced invoices for the temporary repair and replacement of the broken glass door. Erin Payne, owner and manager of Kings County Glass, testified that on Sunday, August 2, 2020, the business performed "an emergency weekend board up" on the damaged door at the police department. The business charged $300, which Ms. Payne described as a reasonable price for an emergency boarding job performed on a weekend.

David Lockwood, owner of Hanford Glass, testified that on Monday, August 3, 2020, he received a work order from the police department because "the glass had broken out of the door that goes into the main door of the police department." Lockwood measured the frame and ordered the safety glass that was required to replace that door. It took three days to get safety glass because it was not readily available. On August 6, 2020, Lockwood installed the safety glass. The cost to replace the glass door was $298, which Lockwood described as a reasonable amount.

---

[3] The Court relies on the California Court of Appeal's September 14, 2022 opinion for this summary of the facts of the offense and procedural history. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

As will be explained below, the prosecution argued the actual damage to the door was $598.

**Defense**

Defendant testified that he was self-employed and washed cars. Defendant had a prior strike conviction from 2009.

At trial, defendant admitted he threw the rock through the police department's glass door and testified that he "did it for love." Defendant explained that just before the incident, he used his unemployment benefits to purchase a 2004 "shiny red" Cadillac CTS with a sunroof. "I was just in love with this car" and "it was the only thing in this world that I loved." He was homeless, he considered the car as his home, and his possessions were stored in the car. His cousin told him not to drive the car until he completed the registration process. He parked the car on 8th Street and walked to a friend's house.

Defendant testified that he felt that he needed to go back and check his car. Around 3:00 p.m., he arrived at the location where he parked the Cadillac and found police officers were "searching his car." "I was like what are you doing with my car. So they jammed me up, pulled me to the side, gave me the field sobriety test and – and the sun was in my eyes so I turned like toward Harris Street ... and [when] I turned toward 8th Street back to the car and when I was done with the sobriety test the car was gone, they towed it. I got irate, irrational."

According to defendant, the officers said they towed the car because of the registration: "They told me I didn't have registration for the car, and they don't have to tell me anything. I am not the owner – the registered owner of the car. And I was like, I have the keys right here on my neck, and they was like that doesn't matter, whatever. So I was like I would like to file a [citizen's complaint] ... I will write your ass up ... and they was like whatever but your car is gone. *So I didn't know where the towing company had it* or anything like that the VIN numbers, anything to get it back and ... everything was in the car. My laptop, my phones, my jewelry, my money, clothes, everything...." (Italics added.)

On further questioning, defendant admitted that one officer told him the car was taken to Hanford Towing. Defendant did not go to the tow yard because it was too far away.

Around 5:00 p.m., defendant walked to the Hanford Police Department to file a citizen's complaint. He entered the police department, and an officer was "really aggressive" toward him. "[S]omeone at the door [said] you get out of here, you leave right now. And I was like I just want to file [a] ... citizen complaint form. And they was like, no, you leave right now, you cannot have a citizen complaint. I said, well, they took my car, and he was like so what[,] you get out now, or you will be arrested. So I just hung my head and I just bounced."

Defendant testified that he stayed around the civic auditorium all night, "getting high, whatever, just chilling, just trying to figure out what to do."

"I don't have my car, I have nothing. I didn't have my EDD card in my pocket. I didn't have no money or nothing, so I don't know, it just – morning came and I was out of drugs I thought, and I was just wandering around the streets and I seen the rock and I was like them bastards, they took ... the only thing I owned, the

3

only thing I loved, they took it from me. They ripped it from my heart. [¶] That is why I threw the rock through the window. Something told me in my head do not do it, do not do it, and I shook it off. I should have listened to that voice in my head. I should have listened to that voice in my head, but I threw the rock and I am here."

Defendant was arrested that night, and admitted an officer found drugs in his sock when he was booked at the jail. Defendant testified that he was surprised the drugs were in his sock, forgot he had the drugs, and did not realize he brought drugs into the jail: "I sure wish I would have known, because I would have smoked that up."

Cross, 2022 WL 4230918, at *1–3.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kings County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

4

1    As a threshold matter, this Court must "first decide what constitutes 'clearly established
2 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71
3 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this
4 Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
5 of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words,
6 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles
7 set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,
8 the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal
9 principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in
10 . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of
11 review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.
12 Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.
13 Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an
14 end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552
15 U.S. at 126; Moses, 555 F.3d at 760.

16    If the Court determines there is governing clearly established Federal law, the Court must
17 then consider whether the state court's decision was "contrary to, or involved an unreasonable
18 application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.
19 § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the
20 state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question
21 of law or if the state court decides a case differently than [the] Court has on a set of materially
22 indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The
23 word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character
24 or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New
25 International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to
26 [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the
27 governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"
28 clearly established Supreme Court precedent, the state decision is reviewed under the pre-

5

1   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

2   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if 3   the state court identifies the correct governing legal principle from [the] Court's decisions but 4   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. 5   "[A] federal court may not issue the writ simply because the court concludes in its independent 6   judgment that the relevant state court decision applied clearly established federal law erroneously 7   or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 8   538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists 9   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." 10  Richter, 562 U.S. at 102. In other words, so long as fairminded jurists could disagree on the 11  correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If 12  the Court determines that the state court decision is objectively unreasonable, and the error is not 13  structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious 14  effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

15  The Court looks to the last reasoned state court decision as the basis for the state court 16  judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 17  (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the 18  reasoning from a previous state court decision, this Court may consider both decisions to 19  ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 20  2007) (en banc). "When a federal claim has been presented to a state court and the state court has 21  denied relief, it may be presumed that the state court adjudicated the claim on the merits in the 22  absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 23  99. This presumption may be overcome by a showing "there is reason to think some other 24  explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. 25  Nunnemaker, 501 U.S. 797, 803 (1991)).

26  Where the state courts reach a decision on the merits but there is no reasoned decision, a 27  federal habeas court independently reviews the record to determine whether habeas corpus relief 28  is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853

6

1 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Sufficiency of the Evidence

Petitioner asserts that there was insufficient evidence to convict him as the actual damage resulting from the vandalism was limited to the replacement cost of $298 and the temporary repair of $300 was an indirect cost and should not have been considered by the jury. (ECF No. 1 at 3.)[4] Respondent argues that Petitioner's claim is actually challenging state statutory interpretation, which is an issue of state law and not a federal question. (ECF No. 7 at 18.)

This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned opinion, and in the California Supreme Court, which summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying the sufficiency the evidence claim, the California Court of Appeal stated:

> Defendant contends his conviction for felony vandalism is not supported by substantial evidence that the amount of actual damage was $400 or more, and the conviction must be reduced to a misdemeanor. Defendant argues that valuation of actual damage from vandalism is limited "to 'direct' abatement costs, determined by the cost of repair," and that amount was limited to $298 to replace the damaged glass door. Defendant asserts the trial court improperly permitted the jury "to consider the additional $300 cost to board up the door pending actual

---

[4] Page numbers refer to the ECF page numbers stamped at the top of the page.

repair," but that amount "served only to secure the premises, not to repair the door," and was "an 'indirect' economic loss" and could not be considered to determine actual damage for felony vandalism.

Defendant concludes that "only direct abatement costs may be included in the valuation. Indirect costs, while recoverable as restitution, are not included. Boarding the door to secure the premises pending actual repair is an indirect cost; therefore, it does not raise the valuation" of actual damage, and his vandalism offense was not a felony.

**I. Standard of Review**

In considering a challenge to the sufficiency of the evidence, "[t]he standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

While defendant has raised this issue as one of substantial evidence, he is effectively arguing the trial court incorrectly interpreted section 594 to permit the jury to consider "indirect" costs to determine if the actual damages resulting from his vandalism was $400 or more, so that offense was a felony. To the extent defendant raises questions of statutory interpretation, we review the issue de novo. (See, e.g., *John v. Superior Court* (2016) 63 Cal.4th 91, 95; *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

**II. Vandalism**

Section 594 states: "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism: [¶] (1) Defaces with graffiti or other inscribed material. [¶] (2) Damages. [¶] (3) Destroys." (§ 594, subd. (a).)

If the amount of the "defacement, damage, or destruction" is $400 or more, the offense is punishable as a felony or a misdemeanor. (§ 594, subd. (b)(1).) If such amount is less than $400, the offense is only punishable as a misdemeanor. (*Id.* at subd. (b)(2)(A).)

Whenever a person violates this provision with respect to property belonging to a public entity, "it shall be a permissive inference that the person neither owned the property or had the permission of the owner to deface, damage, or destroy the property." (§ 594, subd. (a).)

**III. Calculation of Vandalism Damages**

Section 594 "does not itself specify a method for proving the amount of property damage in a vandalism prosecution...." (*Kyle T., supra*, 9 Cal.App.5th at p. 713.)

8

The cases interpreting section 594 have focused on the amount of defacement, damage, or destruction, and calculated that amount as the actual or estimated cost of repair. (See, e.g., *In re A.W.* (2019) 39 Cal.App.5th 941, 950 (*A.W.*); *Kyle T., supra*, 9 Cal.App.5th at pp. 713–714; *People v. Carrasco* (2012) 209 Cal.App.4th 715, 718, reversed on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733, 740–742 [a defendant may be convicted of multiple counts "based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme"].)

These cases have relied on the restitution analysis in a vandalism case, *Luis M. v. Superior Court*, *supra*, 59 Cal.4th 300 (*Luis M.*), for guidance on the calculation of damages to determine if a violation of section 594 was felony or misdemeanor vandalism.

***Luis M.***

In *Luis M.*, *supra*, 59 Cal.4th 300, a minor defaced six locations with nine acts of graffiti. At the restitution hearing, an officer used a five-year-old cost model to estimate the city's annual graffiti abatement costs, that included labor and material costs for both investigation and removal of graffiti. The officer compared that cost model to the city's annual expenditures, calculated the city's average outlay per graffiti incident, and then multiplied that figure by the minor's nine instances of graffiti to arrive at the total amount of loss. (*Id.* at pp. 304, 309–310.) The officer offered "no information about the actual abatement costs related to [the minor's] conduct." (*Id.* at p. 304.) The juvenile court ordered restitution in the amount of $3,881.88, based on the officer's testimony. (*Ibid.*)

*Luis M.* reversed the restitution order because it "was not based on sufficient evidence that the amount of claimed loss was a result of [the minor's] conduct." (*Luis M.*, *supra*, 59 Cal.4th at p. 303.) *Luis M.* cited the general restitution statute applicable to juvenile offenders, noted it was " 'parallel' " to section 1202.4's restitution provisions for adult offenders, and that it limited restitution to " 'economic losses incurred *as the result of the minor's conduct*,' " such as " 'the *actual cost* of repairing the property when repair is possible.' " (*Luis M.* at p. 304; *id.* at p. 305, italics added in original.)

*Luis M.* held the restitution award may include "the materials, equipment, and labor costs incurred for remediation," as well as "[p]reexisting expenditures, such as salaried employees and equipment purchases, ... provided those costs can be fairly apportioned on a pro rata basis to the minor's conduct." (*Luis M., supra*, 59 Cal.4th at p. 309.) While a court awarding restitution "need not ascertain the exact dollar amount of the [c]ity's losses" (*ibid.*) and "retains broad discretion ... to estimate the material, equipment, and labor costs necessary to repair the damage caused by a discrete act of graffiti," (*id.* at p. 310) the calculation "must have some factual nexus to the damage caused by the minor's conduct." (*Id.* at p. 309.) *Luis M.* held the city's restitution model did not reflect the actual or estimated costs to clean up the graffiti caused by the minor's conduct. (*Id.* at p. 303; cf. *People v. Hurtado* (2019) 35 Cal.App.5th 871, 879–880 [trial court's determination of restitution for vandalism conviction had sufficient factual nexus to damage caused by defendant's act, since it applied the standard cost to abate graffiti to the square footage and surface type actually damaged by defendant's acts].)

**Kyle T.**

In *Kyle T.*, *supra*, 9 Cal.App.5th 707, a minor was alleged to have committed one count of felony vandalism based on graffiti defacement. At the juvenile hearing, an officer testified about the amount of damages, based on a single-page " 'graffiti removal cost list' " prepared by an unknown author, that generally summarized the costs of removing graffiti in that area, but without reference to the specific acts committed by the minor. (*Id.* at pp. 710–711.)

*Kyle T.* reversed the juvenile court's adjudication for felony vandalism and held the People failed to present substantial evidence that was specific to the minor's acts of vandalism to establish that the actual amount of damage caused by the minor's act reached the felony threshold of $400. (*Kyle T., supra*, 9 Cal.App.5th at p. 709.) *Kyle T.* acknowledged that section 594 did not specify the method to calculate damages to determine felony vandalism and held *Luis M.*'s discussion of restitution was appropriate to determine damages in a vandalism case. (*Kyle T.*, at p. 716.)

"[S]ection 730.6, subdivision (h) of the Welfare and Institutions Code 'authorizes full restitution for economic losses, including "the *actual cost* of repairing [damaged] property when repair is possible." [Citation.] Awards under [Welfare and Institutions Code] section 730.6 are based on proof of the damage actually linked to *the minor's conduct* ....' [Citation.] This method for determining restitution arising from the abatement of juvenile vandalism 'parallel[s]' the method for determining restitution arising from the abatement of adult vandalism set forth in Penal Code section 1202.4, subdivision (f)." (*Id.* at p. 713.)

*Kyle T.* noted that section 1202.4 similarly defined restitution in adult criminal cases as the amount to fully reimburse the victim for every determined economic loss " 'incurred as the result of the defendant's criminal conduct'; the 'value of ... damaged property shall be ... the actual cost of repairing the property when repair is possible.' " (*Kyle T., supra*, 9 Cal.App.5th at p. 713, citing § 1202.4, subd. (f)(3)(A); see also *People v. Stanley* (2012) 54 Cal.4th 734, 737.)

*Kyle T.* further held that under the " 'actual cost' " method, "the amount of the award 'must have some factual nexus to the damage caused by the [juvenile's] conduct.' " (*Kyle T, supra*, 9 Cal.App.5th at p. 716.) Based on that standard, *Kyle T.* held the juvenile court's felony vandalism finding was not supported by substantial evidence because the officer's recitation of the average cost of graffiti removal, based on a generic, one-page cost list, was an unacceptable method of proving the amount of damage from the minor's specific acts of vandalism. (*Id.* at p. 709.) "The most obvious way for the People to prove that [the minor] committed felony vandalism would have been to introduce at the adjudication hearing an invoice setting forth the actual cost of repairs to the two properties. No such evidence was introduced." (*Id.* at pp. 713–714.) *Kyle T.* suggested "a contractor's estimate of the cost to repair the actual damage that [the minor] caused might have sufficed, ... assuming proper authentication and foundation. But the People afforded no such estimate either." (*Id.* at p. 714; see also *People v. Carrasco*, *supra*, 209 Cal.App.4th at pp. 717–718 [the defendant's conviction for felony vandalism affirmed based on actual cost to repair broken windows in a house and car, destroyed by the defendant's multiple acts of vandalism pursuant to a single intent].

In *A.W.*, *supra*, 39 Cal.App.5th 941, a juvenile court found true five allegations of felony vandalism resulting from the minor's graffiti defacement, and that the

amount of actual damage exceeded the $400 felony threshold. *A.W.* reversed the findings, relied on *Kyle T.* and *Luis M.*, and held that average cleanup costs for graffiti could not be used to prove the actual damage caused by the minor's vandalism because "[t]he use of an average, or arithmetic mean, recognizes that cleanup costs for some graffiti is less than the average, and the cleanup costs for other graffiti exceeds the average. The average cleanup cost is untethered to the actual damage caused by minor." (*A.W., supra*, 39 Cal.App.5th at p. 945.)

*A.W.* also held the juvenile court's calculation of damages for felony vandalism improperly included "the cost of law enforcement, which, though proper in certain restitution settings, was not a proper consideration in assessing the damage [the] minor inflicted under section 594." (*A.W., supra*, 39 Cal.App.5th at p. 945.) In doing so, *A.W.* relied on *Luis M.*'s discussion of the restitution statutes and distinguished between actual and indirect costs. (*A.W.*, at p. 950.)

"[Welfare and Institutions Code section 730.6] ... permits recovery of the 'actual cost of repairing the property ....' [Citation.] Similarly, section 594 requires the People to prove the amount of 'defacement, damage, or destruction,' which we interpret to include the cost of repairing or replacing the vandalized property. While the two statutes are different in that the burden of proof is much higher under section 594, they cover roughly the same categories of costs. What makes *Luis M.* instructive is that in the context of Welfare & Institutions Code section 730.6, our high court held that law enforcement costs are *not* recoverable: 'These general provisions do not authorize restitution orders for law enforcement investigative costs. [Citations.] "Under the relevant case law and the statutory scheme, public agencies are not directly 'victimized' for purposes of restitution under Penal Code section 1202.4 merely because they spend money to investigate crimes or apprehend criminals." ' [Citation.] *Instead, restitution is limited to the cost of repair, replacement, or restoration – these 'direct abatement costs' do 'not include the costs of investigation.*' [Citation.] Given the similarities in the recoverable categories of costs, investigative costs also cannot be included in the damage calculation under section 594." (*Ibid.*, italics added.)

**IV. Analysis**

In this case, the court's decision to permit the jury to consider the prosecution's evidence of the costs for both the "emergency board up" and replacement of the glass door was appropriate under section 594. We agree with the analysis in *Kyle T.*, based on the discussion in *Luis M.*, that damages for the purpose of determining felony vandalism is based on the actual cost of repairing the property when repair is possible. (*Kyle T., supra*, 9 Cal.App.5th at p. 713.) To the extent that defendant challenges the court's decision as a question of law, we agree with *A.W.* that the cost of repair, replacement or restoration are direct abatement costs that may be included in the damage calculation under section 594. (*A.W., supra*, 39 Cal.App.5th at p. 950.)

We further conclude there is substantial evidence to support the jury's finding that the damages resulting from defendant's vandalism exceeded $400, based on $300 for the temporary "emergency board up" and $298 for the permanent replacement of the glass door. We reject defendant's attempt to characterize the "emergency board up" as an "indirect" cost that must be excluded from the calculation of damages resulting from his act of vandalism. Defendant shattered the glass door at approximately 3:00 a.m. on a Sunday. The very timing of his act precluded any possibility the door could be immediately replaced. Under the circumstances, the temporary placement of boards would be necessary to secure the damaged main

> entrance to any structure, whether a business or a residence, and ensure the occupants remained safe, and the contents were not subject to theft, destruction, or further vandalism, until a replacement door was installed. In this case, there was even more urgency to immediately and temporarily secure the front entrance since defendant's vandalism damaged the glass entrance to a police department.
>
> The police department's retention of Kings County Glass to temporarily install boards over the damaged front entrance was part of the direct and actual costs resulting from defendant's vandalism. It was part of the process set in motion by defendant's conduct, and necessary to secure the department's front entrance on a Sunday, until the glass door could be permanently replaced. There was thus substantial evidence to support the jury's finding that the damages from the vandalism exceeded $400, since securing the building's entrance immediately after the vandalism was a direct, reasonable, and actual cost of the process to permanently repair the door.
>
> In contrast to *Kyle T.* and *A.W.*, the prosecution's evidence of the amounts charged by the two glass companies was based on testimony about the actual costs of the materials and services required to temporarily repair and permanently replace the actual damage resulting from defendant's vandalism of the glass door, and not based on speculative averages or estimates unrelated to the actual damage.
>
> While defendant suggests the police department could have used another glass company or a less expensive method to repair or monitor the shattered door, he never introduced any evidence to undermine the reasonableness of Kings County Glass's charge of $300 for the emergency "board up" job on a Sunday, Hanford Glass's charge of $298 for the requisite safety glass, that safety glass was required for the police department's front entrance, or that three days were required to obtain delivery of the safety glass.

Cross, 2022 WL 4230918, at *6–10.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. "Under Jackson, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

"'After AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

Here, the California Court of Appeal held that the trial "court's decision to permit the jury to consider the prosecution's evidence of the costs for both the 'emergency board up' and replacement of the glass door was appropriate under section 594." Cross, 2022 WL 4230918, at *9. This determination is binding on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Thus, to the extent Petitioner challenges the state court's interpretation of section 594, the Court finds that is an issue of state law not cognizable in federal habeas corpus. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). To the extent the claim is construed as challenging the sufficiency of the evidence, the Court finds that viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that the damages exceeded $400 based on $300 for the temporary "emergency board up" and $298 for the permanent replacement of the glass door.

"When the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review," Cavazos, 565 U.S. at 7, the Court finds that the state court's decision denying Petitioner's sufficiency of evidence claim was not contrary to, or an

1 unreasonable application of, clearly established federal law. The decision was not "so lacking in
2 justification that there was an error well understood and comprehended in existing law beyond
3 any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is
4 not entitled to habeas relief on this claim, and it should be denied.

**B. Jury Instruction**

Petitioner asserts that an instructional error and misstatement by the court lessened the prosecution's burden of proof. (ECF No. 1 at 4.) Respondent argues that the instructional error claim is procedurally barred and fails on the merits. (ECF No. 7 at 19.)

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). In determining whether a state procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804.

Here, Petitioner's jury instructional error claim was raised in a state habeas petition filed in the California Supreme Court along with the sufficiency of the evidence claim that had been raised on direct appeal. (LD 20.) In denying relief, the California Supreme Court stated:

> The petition for writ of habeas corpus is denied. Individual claims are denied, as applicable. (See *In re Waltreus* (1965) 62 Cal.2d 218, 225 [courts will not entertain habeas corpus claims that were rejected on appeal]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal]; *In re Lindley* (1947) 29 Cal.2d 709, 723 [courts will not entertain habeas corpus claims that attack sufficiency of the evidence].)

(LD 21.) Thus, the California Supreme Court denied relief with respect to Petitioner's instructional error claim because the claim could have been, but was not, raised on appeal with a

14

citation to In re Dixon, 41 Cal.2d 756, 759 (1953). The California Supreme Court clearly and expressly stated that its judgment rests on the Dixon bar, and procedural default is appropriate because the Supreme Court has held that the Dixon bar "qualifies as adequate to bar federal habeas review." Johnson v. Lee, 578 U.S. 605, 609 (2016).

Based on the foregoing, the Court finds that the California Supreme Court expressly invoked an independent and adequate procedural rule in California, commonly referred to as the Dixon bar, and Petitioner has procedurally defaulted this claim. A petitioner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." Martinez v. Ryan, 566 U.S. 1, 10 (2012) (citing Coleman, 501 U.S. at 750). Petitioner did not file a reply to the answer and thus, has not established cause and prejudice for his default. Accordingly, the Court finds that Petitioner is procedurally barred from bringing this claim and it should be dismissed. In any case, Petitioner's claim is without merit.

2.   Merits Analysis

A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). The "only question for [a federal habeas court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).

Citing to page 924 of the Reporter's Transcript on Appeal, Petitioner contends that the trial court misread the CALCRIM 2901 instruction to the jury as follows:

> "If you find the defendant guilty of vandalism in Count (1) you must decide whether the People have proved that the amount of damage caused by the vandalism was 400.00 or more. The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has been proved."

(ECF No. 1 at 4 (emphasis supplied by Petitioner).) Respondent argues that "Petitioner's claim is misguided" because "Petitioner quotes the Court of Appeal's decision" and it "appears that the state court of appeal incorrectly quoted the reporter's transcript on appeal." (ECF No. 7 at 20.)

///

Upon review of the record, the Court finds that Petitioner's claim is based on a misapprehension of the record (i.e., based on a clerical error in the California Court of Appeal's decision that misquotes the transcript). In the appellate court's opinion, the California Court of Appeal states:

> The court also gave CALCRIM No. 2901:
>
>> "If you find the defendant guilty of vandalism in Count 1, you must decide whether the People have proved that the amount of damaged caused by the vandalism was $400 or more. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation *has been proved*." (RT 924)

Cross, 2022 WL 4230918, at *4 (emphasis added). However, page 924 of the Reporter's Transcript on Appeal actually states:

> . . .If you find the defendant guilty of vandalism in Count 1, you must then decide whether the People have proved that the amount of damage caused by the vandalism was $400 or more.
>
> The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has *not* been proved.

(7 RT[5] 924 (emphasis added).) Similarly, the relevant written instruction given to the jury for use during deliberations states:

> If you find the defendant guilty of vandalism in Count One, you must then decide whether the People have proved that the amount of damage caused by the vandalism was $400 or more.
>
> The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has *not* been proved.

(2 CT[6] 547 (emphasis added).)

Accordingly, the Court finds that Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

///

///

///

---

[5] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 6.)
[6] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 6.)

## V.

## RECOMMENDATION & ORDER

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

Further, the Clerk of Court is DIRECTED to randomly assign this action to a District Judge.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **February 23, 2024**

UNITED STATES MAGISTRATE JUDGE